803 F.2d 1186
 256 U.S.App.D.C. 108
 REGULAR COMMON CARRIER CONFERENCE, et al., Petitioners,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents,
Haslerig Trucking Company, Inc., Intervenor.
REGULAR COMMON CARRIER CONFERENCE, et al., Petitioners
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents.
DEATON, INC., Petitioner,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents.
 Nos. 85-1373, 85-1374 and 85-1394.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Sept. 5, 1986.
Decided Oct. 10, 1986.
As Amended Oct. 10, 1986.
 
 Joan M. Darby, with whom Robert J. Higgins and Ellen M. Athas, Washington, D.C., were on the brief, for Intern. Broth. of Teamsters, Chauffeurs, Warehousemen and Helpers of America, petitioners in Nos. 85-1373 and 85-1374.
 Kevin M. Williams, with whom Daniel R. Barney, Kenneth E. Siegel and William S. Busher, Alexandria, Va., were on the joint brief for Regular Common Carriers Conference, et al., petitioners in Nos. 85-1373, 85-1374 and 85-1394. Kim D. Mann also entered an appearance for petitioner in No. 85-1394.
 Lawrence H. Schecker, Atty., I.C.C., with whom Robert S. Burk, General Counsel, John J. McCarthy, Jr., Deputy Associate General Counsel, I.C.C., Robert B. Nicholson and Marion Jetton, Attys., Dept. of Justice, Washington, D.C., were on the brief for respondents in Nos. 85-1373, 85-1374 and 85-1394.
 Before WALD, Chief Judge, MIKVA, Circuit Judge, and LEIGHTON,* Senior District Judge.
 Opinion for the Court filed by Chief Judge WALD.
 WALD, Chief Judge:
 
 
 1
 Petitioners in these consolidated cases seek review of three orders of the Interstate Commerce Commission ("ICC" or "Commission"). In each order, the Commission granted an application for a permit to "operate as a contract carrier, ... transporting general commodities (except classes A and B explosives and household goods), ... under continuing contract(s) with commercial shippers or receivers of such commodities." Joint Appendix ("J.A.") at 73, 163A, 201 (emphasis in original).[1] Because we conclude that in each case the Commission acted within the scope of its authority to issue contract carrier permits, see 49 U.S.C. Sec. 10923, and to determine what evidence applicants for such permits must present, the petitions for review are denied.
 
 I. BACKGROUND
 
 2
 A. The Statutory Definition of Motor Contract Carriage
 
 
 3
 At issue is the meaning of the statutory definition of motor contract carriage, now codified at 49 U.S.C. Sec. 10102(14)(B). That section defines a "motor contract carrier" as
 
 
 4
 (B) a person providing motor vehicle transportation of property for compensation under continuing agreements with one or more persons--
 
 
 5
 (i) by assigning motor vehicles for a continuing period of time for the exclusive use of each such person; or
 
 
 6
 (ii) designed to meet the distinct needs of each such person.
 
 
 7
 In issuing the permits challenged here, the Commission relied on Sec. 10102(14)(B)(i), commonly referred to as the "dedication of equipment" prong of the definition. (Section 10102(14)(B)(ii) is referred to as the "distinct needs" prong.) An applicant for a permit to operate as a motor contract carrier must satisfy only one of the two tests. Aero Mayflower Transit Co. v. ICC, 711 F.2d 224, 227 (D.C.Cir.1983).
 
 
 8
 In contrast, a "motor common carrier" is defined as "a person holding itself out to the general public to provide motor vehicle transportation for compensation." 49 U.S.C. Sec. 10102(13). There are significant differences in the kind and degree of regulation imposed upon common and contract carriers. For example, common carriers are required to file with the Commission tariffs specifying rates for the transportation they provide; contract carriers are not.[2] A common carrier may not "charge or receive from a person a different compensation ... for a service rendered ... than it charges or receives from another person for performing a like and contemporaneous service," nor may it "subject a person, place, port, or type of traffic to unreasonable discrimination." 49 U.S.C. Sec. 10741(a)-(b). Contract carriers, on the other hand, are not subject to these anti-discrimination provisions. See Central & Southern Motor Freight Tariff Ass'n v. United States, 757 F.2d 301, 325 (D.C.Cir.), cert. denied, --- U.S. ---, 106 S.Ct. 568, 88 L.Ed.2d 553 (1985).
 
 
 9
 Contract carriage and common carriage were distinguished originally in the Motor Carrier Act of 1935, Pub.L. No. 74-255, 49 Stat. 543, which was "designed ... in large part, to prevent depression-squeezed contract carriers from encroaching on the domain of common carriers." Central & Southern Motor Freight, 757 F.2d at 309; see Contracts of Contract Carriers, 1 M.C.C. 628, 629 (1937) ("The underlying purpose [of the 1935 Act] is plainly to promote and protect adequate and efficient common-carrier service.... The patent object of Congress is to protect the common carriers against cut-throat competition."), modified, 11 M.C.C. 693 (1938).[3] The 1935 Act defined a "contract carrier by motor vehicle" as a person who provided transportation of passengers or property by motor vehicle for compensation "under special and individual contracts or agreements." Pub.L. No. 74-255, Sec. 203(a)(15), 49 Stat. 543, 544-45 (1935).
 
 
 10
 Worried in 1957 that "[t]he present law has proved inadequate to maintain proper distinctions between common and contract carriage," Congress made several changes in the definition of contract carriage. S.Rep. No. 703, 85th Cong., 1st Sess. 7, reprinted in 1957 U.S.Code Cong. & Admin.News 1599, 1604.[4] The 1957 amendments required a contract carrier to enter into "continuing contracts with one person or a limited number of persons"[5] and to meet either the dedication of equipment or the distinct needs test. Pub.L. No. 85-163, Sec. 1, 71 Stat. 411, 411 (1957). The aim of the 1957 amendments was to provide greater protection for the interests of common carriers. See S.Rep. No. 703, 85th Cong., 1st Sess. 7 (bill required by public interest "in a stable and adequate system of common carriage"), reprinted in 1957 U.S.Code Cong. & Admin.News 1599, 1605; cf. Central & Southern Motor Freight, 757 F.2d at 310 (aim of 1957 amendments "was unabashed protection of common carriers").
 
 
 11
 The statutory definition of contract carriage was again amended by the Motor Carrier Act of 1980, Pub.L. No. 96-296, 94 Stat. 793. The premise of the 1980 Act, however, was that "the statutes governing Federal regulation of the motor carrier industry are outdated and must be revised to reflect the transportation needs and realities of the 1980's." Pub.L. No. 96-296, Sec. 3, 94 Stat. 793, 793 (codified at 49 U.S.C. Sec. 10101 note).[6] With respect to contract carriers, the Act was intended to "remove[ ] many of the obstacles that have kept motor contract carriers from realizing their full potential." H.R.Rep. No. 1069, 96th Cong., 2d Sess. 22, reprinted in 1980 U.S.Code Cong. & Admin.News 2283, 2304. The Motor Carrier Act eliminated the requirement that a contract carrier enter into agreements with a "limited number of persons." Pub.L. No. 96-296, Sec. 10(a)(1), 94 Stat. 793, 799 (1980). The congressional reports indicate that this change was intended to ratify the Commission's recent abolition of the "Rule of Eight," under which the Commission had for many years limited the number of shippers a contract carrier could serve to eight,[7] but that "[m]otor contract carriers will continue to be required to meet the standard of dedication of equipment or providing a service to meet a shipper's distinct need, but will be able to expand their service to serve more shippers." H.R.Rep. No. 1069, 96th Cong., 2d Sess. 22, reprinted in 1980 U.S.Code Cong. & Admin.News 2283, 2304; S.Rep. No. 641, 96th Cong., 2d Sess. 27 (1980). The 1980 Act eliminated several other restrictions on the operations of contract carriers: it permitted a carrier to operate as both a contract and a common carrier, prohibited the Commission from requiring a contract carrier "to limit its operations to carriage for a particular industry or within a particular geographic area," and authorized contract carriers to provide services to freight forwarders. Pub.L. No. 96-296, Sec. 10, 94 Stat. 793, 799-801 (1980); see H.R.Rep. No. 1069, 96th Cong., 2d Sess. 22-23, reprinted in 1980 U.S.Code Cong. & Admin.News 2283, 2304-05.
 
 B. The Commission's 1983 Policy Statement
 
 12
 In deciding to issue the permits challenged here, the ICC relied on its policy statement, Issuance of Permits Authorizing Industry-wide Service, 133 M.C.C. 298 (1983), in which the Commission announced that applicants would be granted contract carrier authority "to serve an industry or industries as a class, ... provided applicant meets the equipment dedication or distinct needs test of contract carriage with respect to the class as a whole." Id. at 298. Noting that "[t]here is no longer any statutory justification for restricting the scope of competitive activity among contract carriers," the Commission concluded that "[g]ranting contract carrier permits by class or industry provides important potential competition because it allows contract carriers to solicit additional contracts without obtaining prior regulatory approval to serve new customers." Id. at 301. The Commission stated that an applicant for a contract carrier permit could satisfy the dedication of equipment requirement by "represent[ing] that it will enter into contracts only with those shippers to which it will dedicate equipment," and it refused to "require the dedication of specific equipment to each shipper within a given class prior to service." Id. at 301-02. The Commission reasoned that such a requirement would "create an evidentiary impasse," id. at 301, apparently because an applicant would be unable to dedicate equipment to specific shippers without identifying which shippers it intended to serve. The Commission also announced that an applicant for a contract carrier permit to serve a class of shippers need not submit statements of shipper support, noting that the applicable ICC regulation "permits applicants to submit verified certifications of shipper or witness support." Id. at 302 & n. 7 (emphasis in original) (citing 49 C.F.R. Sec. 1160.5(d)).
 
 
 13
 C. The Haslerig Trucking Company Proceeding (No. 85-1373)
 
 
 14
 Haslerig Trucking Company, Inc. ("Haslerig") applied in December, 1984 for a contract carrier permit to transport general commodities under continuing contracts with commercial shippers or receivers of such commodities. J.A. at 7. In its application, Haslerig stated that it would meet the statutory requirements of contract carriage "[b]y assignment of motor vehicles for a continuing period of time for the exclusive use of class of persons served. In addition, applicant will meet any distinct needs that may be required in providing service." J.A. at 9.
 
 
 15
 Haslerig's president submitted a verified statement in support of the application, in which he indicated that Haslerig was already operating as a contract carrier, but that it was seeking a broader commodity authorization to enable it to "provide a more efficient, responsive and dedicated service to its shippers." J.A. at 12. Haslerig also submitted certificates of support from five shippers. All of the shippers indicated that they were currently using common carrier transportation services, and all left blank the spaces provided for shippers to list "Unsatisfactory aspects of these [current] services, if any" and "Specialized service needs, if any." J.A. at 18, 21, 24, 27, 30.
 
 
 16
 The American Trucking Associations, Inc., Regular Common Carrier Conference, and International Brotherhood of Teamsters, petitioners in this case, filed protests in opposition to Haslerig's application. J.A. at 65. The protestants argued that the proposed contract carrier authority contravened the statutory definition of contract carriage and effectively eradicated the distinction between contract carriage and common carriage which Congress intended to preserve. J.A. at 40-43, 58-61. Granting the application would, moreover, place contract carriers in direct competition with common carriers of general commodities. Because contract carriers are permitted to discriminate with respect to the shippers they serve and the prices they charge, contract carriers would be able to "corner the most profitable traffic by refusing to serve, or charging discriminatory rates to, the less attractive shippers," creating a "ruinous competitive disadvantage" for common carriers. J.A. at 61.
 
 
 17
 The ICC granted Haslerig's application on May 14, 1985. The Commission determined that Haslerig had satisfied the dedication of equipment prong of the statute:
 
 
 18
 Applicant ... has proposed to dedicate equipment to the exclusive use of each shipper with which it will contract. It has thus satisfied the exclusive use test, and its proposal therefore meets the statutory definition of contract carriage.
 
 
 19
 J.A. at 68. The Commission also concluded that the class to be served, which it defined as "those commercial shippers with whom applicant will enter into continuing contracts under which it agrees to dedicate at least one vehicle to the contracting shipper," was a valid class under 49 U.S.C. Sec. 10923(d)(2).[8] J.A. at 69. Finally, the Commission considered the public interest criteria set out at 49 U.S.C. Sec. 10923(b)(3). The Commission noted that Haslerig was an experienced contract carrier, and that granting the application would enable it both to provide more complete service to its current shippers and to expand its contract carrier operations to other shippers. Rejecting arguments raised by the protestants about possible competitive disadvantage to common carriers, the Commission stated that "[r]estricting the growth of contract carriers to insulate common carriers from competition, as protestants apparently would have us do, is not the approach taken by the Motor Carrier Act of 1980." J.A. at 69. The Commission found that denial of the application would restrict Haslerig's ability to expand its services, would force Haslerig to "expend additional funds and energies in filing applications for permits each time it finds a shipper desirous of contracting for its service," and would deprive shippers "of the availability of a variety of service and price options." J.A. at 69-70. Based on its consideration of these factors, the Commission concluded that the application should be granted. J.A. at 70.
 
 
 20
 Chairman Taylor dissented from the decision, noting that the Commission had authorized Haslerig "to serve essentially all potential shippers and receivers of general commodities." J.A. at 71 (emphasis in original). Because, in his view, "a 'class' means something less than all potential shippers and receivers," Chairman Taylor concluded that the Commission had failed to follow its decision in Issuance of Permits Authorizing Industry-wide Service, 133 M.C.C. 298 (1983), in which it announced that contract carrier applicants could be authorized to serve an "industry or industries as a class." J.A. at 71.
 
 
 21
 D. The River Bend Transport Company Proceeding (No. 85-1374)
 
 
 22
 River Bend Transport Company ("River Bend") also applied in December, 1984 for contract carrier authority to transport general commodities under continuing contracts with shippers, receivers, or brokers of those commodities. J.A. at 81. In a statement submitted by River Bend's president, the applicant indicated that it currently held both common carrier authority to transport general commodities and contract carrier authority to transport a wide variety of commodities under continuing contracts with shippers, distributors, manufacturers or receivers of such commodities. J.A. at 87-88. River Bend stated that it was seeking broader contract carrier authority because it had been "requested by its existing customers to haul products not encompassed by the [current] contract carrier authority." J.A. at 88. It indicated that it would meet the statutory definition of contract carriage by "dedicat[ing] equipment to the exclusive use of shippers, receivers and brokers requiring the same." J.A. at 93. River Bend did not submit any statements of shipper support for its application. J.A. at 100.
 
 
 23
 The American Trucking Associations, Inc., Regular Common Carrier Conference, and International Brotherhood of Teamsters protested River Bend's application. In addition to reiterating the arguments they made in the Haslerig proceeding, the protestants argued that "in the absence of evidence presented by supporting shippers, the Commission cannot make the requisite reasoned findings under 49 U.S.C. Sec. 10923(b)(3)." J.A. at 158; see J.A. at 108-09.
 
 
 24
 The ICC granted River Bend's application on April 22, 1985. As in the Haslerig decision, the Commission defined the class of shippers to be served as those commercial shippers with whom the applicant would enter into contracts under which it agreed to dedicate equipment to the shipper's exclusive use. J.A. at 159. The Commission concluded that the dedication of equipment test was satisfied by the applicant's "propos[al] to dedicate at least one vehicle to the exclusive use of each shipper with which it will contract." J.A. at 159.
 
 
 25
 Noting that "applicant holds extensive common and contract carrier authority and has been serving contracting shippers in numerous industries," the Commission stated that it could make the "reasoned findings" required by 49 U.S.C. Sec. 10923(b)(3) without statements of shipper support for the application. J.A. at 159. The Commission found that granting River Bend the authority it sought "would enable it not only to provide current contracting shippers a more complete service but also to logically expand its already extensive contract carrier operation," while denial of the application would "prevent [River Bend] from expanding its services in a manner consistent with the Motor Carrier Act," would require it to return to the Commission for additional authority before it could contract to serve new shippers, and would "deprive shippers of the availability of a variety of service and price options." J.A. at 159-60. Chairman Taylor again dissented on the same grounds as in the Haslerig decision. J.A. at 161.
 
 
 26
 E. The Guy Clark & Son Proceeding (No. 85-1394)
 
 
 27
 Guy Clark & Son ("Guy Clark") applied in November, 1984 for authority to operate as a contract carrier transporting general commodities under continuing contracts with commercial shippers, receivers or brokers of such commodities. J.A. at 168. Guy Clark indicated that it would satisfy the statutory requirements "[b]y both (1) providing a specialized service tailored to meet the distinct needs of the above named classes of persons and (2) by the assignment of motor vehicles for a continuing period of time for the exclusive use of the classes of persons shown above." J.A. at 169; see also J.A. at 175.
 
 
 28
 In its statement in support of the application, Guy Clark indicated that it was currently operating as a contract carrier transporting lumber, wood products, and building materials for five named shippers. J.A. at 173. Guy Clark stated that it was seeking broader contract carrier authority because its current shippers had other commodities which they wanted Guy Clark to transport, and because other shippers had expressed a desire to use Guy Clark's services. J.A. at 173-74. Guy Clark submitted no statements of shipper support for the application. J.A. at 199.
 
 
 29
 Deaton, Inc. ("Deaton"), the petitioner in No. 85-1394, protested the Guy Clark application.[9] Deaton argued that because "Clark's headquarters from which it proposes to conduct operations is in the very heart of Deaton's operation," the proposed permit would allow Guy Clark to "divert a portion of the traffic which Deaton desperately needs in order to maintain its daily operations." J.A. at 182-83. Deaton also argued that Guy Clark's application had failed to establish a prima facie case for a grant of contract carrier authority "because it does not contain any shipper support or other type of supporting evidence for the proposed operation." J.A. at 182.
 
 
 30
 In a brief decision issued on March 26, 1985, the Commission (Division 1) granted Guy Clark's application. Relying on its 1983 statement of policy, the Commission stated that the absence of shipper support did not preclude it from granting the application. J.A. at 200 (citing Issuance of Permits Authorizing Industry-wide Service, 133 M.C.C. 298, 302-03 (1983)). The Commission noted that "[a]pplicants state that they will not only dedicate equipment to the exclusive use of contracting shippers, but that they will set up a specialized service designed to meet the specific and precise needs of contracting shippers" and concluded that Guy Clark had satisfied both the dedication of equipment and the distinct needs tests. J.A. at 199-200. In considering the criteria of 49 U.S.C. Sec. 10923(b)(3), the Commission found that Deaton had not shown that a grant of the authority sought "would endanger or impair its operations to an extent contrary to the public interest." J.A. at 200. Denial of the requested authority, on the other hand, might force shippers to use services which were inadequate to meet their shipping needs and would require Guy Clark to file a separate application for contract carrier authority to serve each additional shipper. J.A. at 200.
 
 
 31
 Deaton appealed the Commission's decision, arguing that there was no evidence in the record to support Guy Clark's application or the Commission's conclusion. J.A. at 202-08. The appeal was heard by the three commissioners who issued the original decision.[10] They concluded that their original evaluation of the evidence and arguments was correct and that Guy Clark had met its burden of establishing a prima facie case for a grant of contract carrier authority. J.A. at 213.
 
 II. ANALYSIS
 
 32
 The petitioners challenge the orders at issue here on two grounds. They argue first, that the issuance of a contract carrier permit to serve the class of commercial shippers of general commodities contravenes the statutory definition of contract carriage and second, that an applicant for a contract carrier permit must submit statements of shippers indicating that the shippers need or want to use the applicant's equipment.
 
 
 33
 A. The Validity of the Class of Commercial Shippers of General Commodities Under Sec. 10102(14)(B)(i)
 
 A motor contract carrier permit must
 
 34
 specify necessary conditions, including each person or class of persons ... for which the carrier may provide transportation--
 
 
 35
 (A) to ensure that the carrier provides transportation as a motor contract carrier and within the scope of the permit....
 
 
 36
 49 U.S.C. Sec. 10923(d)(2)(A). The petitioners do not dispute that the Commission may issue a contract carrier permit to serve a class of shippers--indeed, this is clear from the statute itself. Rather, the petitioners assert that the class involved here--commercial shippers of general commodities--is so broad that the Commission cannot fulfill its statutory responsibility to ensure that the applicants will operate as contract carriers by dedicating equipment to each person served.
 
 
 37
 Petitioners correctly assert that the class of commercial shippers of general commodities "is the broadest possible shipper class." Brief of Petitioner International Brotherhood of Teamsters at 22. As Chairman Taylor noted in dissenting from the Haslerig and River Bend decisions, "the applicant here has been permitted to serve essentially all potential shippers and receivers of general commodities." J.A. at 71, see J.A. at 161 (emphasis in original).[11] The Commission makes no attempt to argue that the terms "commercial shippers" and "general commodities" place any limit on the breadth of the class to be served. Instead, the Commission concedes that the class embraces all those commercial shippers with whom an applicant will enter into continuing contracts under which it agrees to assign at least one vehicle for the exclusive use of each shipper. See J.A. at 69, 159. In defining the class as those shippers to whom an applicant will dedicate equipment after the permit is issued, the Commission takes the view that, under the dedication of equipment test, an applicant for a contract carrier permit is not required to identify and dedicate equipment to each shipper in the class to be served at the time the application is filed. The ICC's position is rather that the dedication of equipment test is satisfied if an applicant "represent[s] that it will enter into contracts only with those shippers to which it will dedicate equipment." Issuance of Permits Authorizing Industry-wide Service, 133 M.C.C. 298, 301-02 (1983).
 
 
 38
 We find that, although unprecedentedly broad, the Commission's interpretation of the dedication of equipment requirement is consistent with the language of 49 U.S.C. Sec. 10102(14)(B)(i), which requires only that a contract carrier dedicate equipment to each shipper it contracts to serve, not to each shipper it is authorized to serve. Nevertheless, the petitioners argue that the Commission is required to determine whether the definition of contract carriage has been satisfied at the time an application for a contract carrier permit is filed, and that, in order to do this, the Commission must require the applicant to "identify each shipper to be served, and ... 'dedicate equipment' to each shipper's exclusive use." Brief of Petitioner International Brotherhood of Teamsters at 16.[12]
 
 
 39
 In the policy statement on which these decisions were based, the Commission refused to "require the dedication of specific equipment to each shipper within a given class prior to service." Issuance of Permits Authorizing Industry-wide Service, 133 M.C.C. 298, 301 (1983). Instead, the Commission decided to encourage competition among contract carriers and other carriers by "allow[ing] contract carriers to solicit additional contracts without obtaining prior regulatory approval to serve new customers." Id. The Commissioner's emphasis on promoting competition by contract carriers is supported by the Motor Carrier Act of 1980 and its legislative history, which indicate that one of the principal goals of the Act was to increase competition among motor carriers by eliminating anticompetitive government regulations. See H.R.Rep. No. 1069, 96th Cong., 2d Sess. 3 (Act provides "legislative solution aimed at increasing competition and reducing unnecessary federal regulations"), reprinted in 1980 U.S.Code Cong. & Admin.News 2283, 2285; id. at 12 ("Commission must recognize the importance of competition and efficiency in motor carrier operations as the most desirable means for achieving national transportation goals and objectives"), reprinted in 1980 U.S.Code Cong. & Admin.News at 2294; id. at 22 (Act "removes many of the obstacles that have kept motor contract carriers from realizing their full potential"), reprinted in 1980 U.S.Code Cong. & Admin.News at 2304; S.Rep. No. 641, 96th Cong., 2d Sess. 1 (1980) ("bill would ... eliminate some of the most anticompetitive aspects of Government regulation"); id. at 3 ("while the marketplace is not perfect by any means, it is a better regulator of resources and services than a small group of bureaucrats in Washington, D.C."); see also Central & Southern Motor Freight, 757 F.2d at 309 ("Motor carrier regulation has evolved from a regime designed to protect common carriers against competition from contract carriers to one in which common and contract carriers are to compete with each other and with other modes of transportation as well.").[13] To hold that, at the time an application for a contract carrier permit is filed, the applicant must identify in advance each shipper to whom it will dedicate equipment would prevent contract carriers from serving additional customers without returning to the Commission to obtain approval. Such a requirement would thwart the congressional goal of encouraging contract carriers to compete for customers with common carriers and other providers of transportation.
 
 
 40
 As the Fifth Circuit has noted, "[t]he concepts underlying motor contract carriage--dedication of equipment, distinct needs, public interest, and service of the national transportation policy--are not defined by the statute. The Commission is given broad discretion to define these terms...." Global Van Lines v. ICC, 704 F.2d 829, 832 (5th Cir.), modified, 709 F.2d 11 (5th Cir.1983). The question for this court, therefore, "is whether the agency's answer is based on a permissible construction of the statute." Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). In its interpretation of the statute to promote competition by contract carriers, the Commission undoubtedly blurs the distinction between contract carriage and common carriage. But, as this court recently noted, Congress in 1980 "concluded that less regulation and more competition would improve motor carrier service." Central & Southern Motor Freight, 757 F.2d at 320. The Commission's decisions are consistent with this congressional intent, as well as with the language and intent of the 1957 Act, and must be upheld.
 
 
 41
 B. The Petitioners' Contention that an Applicant for a Contract Carrier Permit Must Submit Statements of Shipper Support
 
 
 42
 The petitioners argue that, even if the class of shippers at issue here is a valid one, the permits should have been denied because the applicants failed to submit statements of shippers indicating that the shippers needed or wanted the applicants to dedicate equipment to their exclusive use. The petitioners assert that "[t]he proper focus [of the dedication of equipment test] is whether the shipper needs or wants dedicated equipment, and if so, what type and amount" and, further, that "there must be supporting shipper evidence in order to demonstrate that a shipper needs dedicated equipment." Brief of Petitioners Regular Common Carrier Conference and American Trucking Associations, Inc. ("RCCC Brief") at 24. Because River Bend and Guy Clark submitted no shipper statements in support of their applications, and because the statements submitted by Haslerig did not indicate that shippers "needed or wanted dedicated equipment," RCCC Brief at 7, the petitioners argue that the Commission could not reasonably find that the applicants had met the dedication of equipment test.
 
 
 43
 The dedication of equipment prong of the statutory definition of contract carriage does not on its face require a showing that shippers need or want the equipment proposed to be dedicated. To satisfy the dedication of equipment test, an applicant must demonstrate that it will provide "a degree of continuing commitment, of continuity in service at some contracted-for level," see Dixie Midwest Express, Inc., 132 M.C.C. 794, 813 (1982), but it need not demonstrate that potential shippers need or desire that commitment.
 
 
 44
 The legislative history of the 1957 amendments indicates that, while Congress sought to amend the statutory definition of contract carriage to emphasize the importance of maintaining "proper distinctions between common and contract carriage," it specifically rejected the need requirement petitioners seek to impose. S.Rep. No. 703, 85th Cong., 1st Sess. 7, reprinted in 1957 U.S.Code Cong. & Admin.News 1599, 1604. As originally introduced, the bill which eventually became Pub.L. No. 85-163 defined a contract carrier as a carrier operating "under continuing contracts with one person or a limited number of persons for the furnishing of transportation services of a special and individual nature required by the customer and not provided by common carriers." S.Rep. No. 703, 85th Cong., 1st Sess. 2, reprinted in 1957 U.S.Code Cong. & Admin.News at 1600 (emphasis added). The bill also provided that a contract carrier permit could only be issued if "existing common carriers are unwilling or unable to provide the type of service for which a need has been shown." Id. at 3, reprinted in 1957 U.S.Code Cong. & Admin.News at 1600 (emphasis added). The Senate Committee on Interstate and Foreign Commerce amended the bill to eliminate both of these provisions on the ground that the bill as originally introduced "would be unduly restrictive on contract carriage." Id., reprinted in 1957 U.S.Code Cong. & Admin.News at 1601. The enactment of the 1957 amendments represented the peak of congressional protectionism toward common carriers. See Central & Southern Motor Freight, 757 F.2d at 310. Even in 1957, however, Congress was unwilling to require, as the petitioners would have us do, that an applicant for a contract carrier permit demonstrate a need for the proposed service.
 
 
 45
 The petitioners argue, however, that the statute implicitly requires an applicant for a contract carrier permit to submit statements of shipper support because without such statements, the Commission is unable to make a reasoned determination of whether granting the application is in the public interest under the criteria set out in 49 U.S.C. Sec. 10923(b)(3). That subsection provides:
 
 
 46
 (3) In deciding whether to approve the application of a person for a permit as a motor contract carrier of property, the Commission shall consider--
 
 
 47
 (A) the nature of the transportation proposed to be provided;
 
 
 48
 (B) the effect that granting the permit would have on the protesting carriers if such grant would endanger or impair their operations to an extent contrary to the public interest;
 
 
 49
 (C) the effect that denying the permit would have on the person applying for the permit, its shippers, or both; and
 
 
 50
 (D) the changing character of the requirements of those shippers.
 
 
 51
 This court has held that, in considering these factors, the Commission is not required to conduct "a detailed analysis of each and an explicit weighing of each against the other. The Commission's determination is adequate if logical processes in reaching that decision are reasonably discernible and the essential basic findings are revealed." International Detective Service, Inc. v. ICC, 613 F.2d 1067, 1077 (D.C.Cir.1979).
 
 
 52
 As the Commission itself acknowledges, the need of shippers for dedicated equipment is a "pertinent issue" in considering the public interest criteria of 49 U.S.C. Sec. 10923(b)(3). Joint Brief for Respondents Interstate Commerce Commission and United States of America at 46 (quoting A.D. McMullen, Inc., No. MC-3328 (Sub-No. 5) (served April 24, 1984)). The petitioners have not explained, however, why the Commission may not rely on an applicant's statements concerning the needs and desires of existing and potential customers, rather than demanding that the applicant submit statements of the shippers themselves. The Commission relied on such statements by applicants in the River Bend and Guy Clark decisions. See J.A. at 155 ("Applicant seeks the involved authority in part because it has been requested by existing customers to haul products not encompassed by its existing contract carrier authority."); id. at 199 ("Applicants state that their present contracting shippers have other commodities which they do not have authority to transport and that other shippers have expressed a desire to utilize their service."). The petitioners have failed to show why the Commission's reliance on these statements is unfounded or why a special evidentiary requirement should be imposed with respect to the issue of shippers' need for dedicated equipment.[14]
 
 III. CONCLUSION
 
 53
 The Commission's decision to grant the permits challenged here was based on a reasonable interpretation of the statutory definition of contract carriage and was consistent with congressional intent. The petitions for review are accordingly
 
 
 54
 Denied.
 
 
 
 *
 Of the United States District Court for the Northern District of Illinois, sitting by designation pursuant to 28 U.S.C. Sec. 294(d)
 
 
 [1]
 The operating authority issued to Guy Clark & Son in one of the permits also excluded carriage of "commodities in bulk." J.A. at 201
 
 
 [2]
 See 49 U.S.C. Sec. 10762(a)(1) ("A motor common carrier shall publish and file with the Commission tariffs containing the rates for transportation it may provide under this subtitle."). While Sec. 10762(a)(1) also requires contract carriers to file tariffs, the ICC is authorized to "grant relief from this section to contract carriers [but not common carriers] when relief is consistent with the public interest and the transportation policy of section 10101 of this title." 49 U.S.C. Sec. 10762(f). The Commission decided in 1983 to exempt all motor contract carriers of property from the tariff-filing requirements. Exemption of Motor Contract Carriers from Tariff Filing Requirements, 133 M.C.C. 150 (1983). That decision was affirmed by this court in Central & Southern Motor Freight Tariff Ass'n v. United States, 757 F.2d 301 (D.C.Cir.), cert. denied, --- U.S. ---, 106 S.Ct. 568, 88 L.Ed.2d 553 (1985)
 
 
 [3]
 In its report on S. 1629, the bill which was enacted as the Motor Carrier Act of 1935, the Senate Committee on Interstate Commerce described the economic conditions which prompted Congress to adopt the legislation:
 In recent years there has been an extraordinary growth of highway transportation. Thousands of miles of hardsurface highways have been developed and are teeming with millions of automotive vehicles. Motor carriers for hire penetrate everywhere and are engaged in intensive competition with each other and with railroads and water carriers. This competition has been carried to an extreme which tends to undermine the financial stability of the carriers and jeopardizes the maintenance of transportation facilities and service appropriate to the needs of commerce and required in the public interest. The present chaotic transportation conditions are not satisfactory to investors, labor, shippers, or the carriers themselves.
 S.Rep. No. 482, 74th Cong., 1st Sess. 2 (1935).
 
 
 [4]
 In explaining the need for the 1957 legislation, the House Committee on Interstate and Foreign Commerce quoted the statement of the Commission's chairman that
 one of the most difficult problems with which the Commission has been faced in recent years in connection with the regulation of motor carriers is the question of determining the line of demarcation between contract carriers and common carriers. Under the present definition of contract carrier, ... some contract carriers have been able to acquire so many contracts that they are actually performing common carrier service. The resulting diversion of traffic from the common carriers could, if continued, seriously impair their ability to render adequate service to the general public, particularly to the smaller shippers who depend almost entirely upon common carrier transportation.
 H.R.Rep. No. 970, 85th Cong., 1st Sess. 2-3 (1957).
 
 
 [5]
 The "limited number" requirement was intended as a rejection of the Supreme Court's decision in United States v. Contract Steel Carriers, Inc., in which the Court held that "[a] contract carrier is free to aggressively search for new business within the limits of his license." 350 U.S. 409, 412, 76 S.Ct.461, 463, 100 L.Ed. 482 (1956); see S.Rep. No. 703, 85th Cong., 1st Sess. 7, reprinted in 1957 U.S.Code Cong. & Admin. News 1599, 1604; H.R.Rep. No. 970, 85th Cong., 1st Sess. 3 (1957). The 1957 amendments also deleted a provision of the Motor Carrier Act that had prohibited the Commission from restricting "the right of the carrier to substitute or add contracts within the scope of the permit." 49 U.S.C. Sec. 309(b) (repealed); see S.Rep. No. 703, 85th Cong., 1st Sess. 8 (1957); H.R.Rep. No. 970, 85th Cong., 1st Sess. 5, 11 (1957), see also ICC v. J.T. Transport Co., 368 U.S. 81, 92, 82 S.Ct. 204, 211, 7 L.Ed.2d 147 (1961) ("[T]he 1957 amendments changed the result of our decision in United States v. Contract Steel Carriers ... by giving the Commission power to limit the number of contracts which a contract carrier can maintain.")
 
 
 [6]
 In its report, the Senate Committee on Commerce, Science, and Transportation stated that
 [t]he regulated sector of the trucking industry, represented by approximately 16,000 motor carriers, has been regulated over the years in such a way as to inhibit market entry, carrier growth, and optimal utilization of equipment and energy resources.... These facts do not result from an evil intent, but rather by the fact that any type of regulation that restricts entry and limits pricing options inherently leads to these undesirable results. The Committee believes that while the marketplace is not perfect by any means, it is a better regulator of resources and services than a small group of bureaucrats in Washington, D.C.
 S.Rep. No. 641, 96th Cong., 2d Sess. 3 (1980).
 
 
 [7]
 See Policy Statement Regarding the "Rule of Eight" in Contract Carrier Applications, 44 Fed.Reg. 2,470 (1979) (stating that Commission would no longer set rigid numerical limit on number of shippers contract carrier may serve)
 
 
 [8]
 49 U.S.C. Sec. 10923(d)(2)(A) requires that a contract carrier permit specify the "person or class of persons ... for which the carrier may provide transportation--to ensure that the carrier provides transportation as a motor contract carrier and within the scope of the permit."
 
 
 [9]
 In its protest, Deaton stated that it was authorized to operate as both a common carrier and contract carrier of property and noted that "Clark seeks authority in this proceeding duplicating in its entirety Deaton's authorized commodities and territory of service." J.A. at 179
 
 
 [10]
 49 C.F.R. Sec. 1011.3(c) provides that "[w]here the Commission's rules permit an appeal to a division from a decision rendered by a division, the appeal shall be heard by the same Commissioners who constituted the division which made the decision appealed from."
 
 
 [11]
 Chairman Taylor argued that the permits did not specify a valid class because "a 'class' must mean something less than all potential users." J.A. at 161 (emphasis in original); see also J.A. at 71. Section 10923(d)(2)(A) does require that a contract carrier permit identify the "person or class of persons" to be served. Repeal of the "limited number" requirement eliminated the only independent statutory restriction on the definition of a class, however, so that any group of shippers is an acceptable "class" under Sec. 10923(d)(2)(A) if the applicant meets the definition of contract carriage with respect to that group. Because we find that the Commission correctly determined that each applicant here satisfied the dedication of equipment prong of the definition with respect to the class of "commercial shippers with whom applicant will enter into continuing contracts under which it agrees to dedicate at least one vehicle to the contracting shipper," see infra at 18-21, we also conclude that this class is a valid one under Sec. 10923(d)(2)(A)
 
 
 [12]
 It is not clear whether the petitioners would require an applicant seeking a contract carrier permit under the distinct needs prong of the statute to identify each shipper to be served. The petitioners acknowledge that the distinct needs test can be satisfied by showing "a specialized need inhering in the entire class" of shippers to be served. Brief of Petitioner International Brotherhood of Teamsters at 16
 The Commission found that the application filed by Guy Clark met both the dedication of equipment and the distinct needs tests. J.A. at 200. Because we conclude that the Commission's interpretation of the dedication of equipment test is a reasonable one and uphold the grant of Guy Clark's permit on that ground, we express no opinion as to the proper construction of the distinct needs prong of the statutory definition of contract carriage. That is the central issue in another case now pending before this court, Global Van Lines v. ICC, No. 83-1938 (D.C.Cir. argued May 1, 1984).
 
 
 [13]
 Petitioners point out that, despite the emphasis in the 1980 Act on the promotion of competition among motor carriers, that Act did not repeal the provision adopted in 1957 which requires a contract carrier to satisfy either the dedication of equipment or the distinct needs test. See Brief of Petitioner International Brotherhood of Teamsters at 12-15. While this observation is certainly correct, it does not follow that the Commission may not find that the dedication of equipment test was satisfied by the applicants in these cases. The legislative history of the 1957 amendments is silent as to the precise meaning of the dedication of equipment test. See S.Rep. No. 703, 85th Cong., 1st Sess., reprinted in 1957 U.S.Code Cong. & Admin.News 1599-1605; H.R.Rep. No. 970, 85th Cong., 1st Sess. (1957). The mere fact that Congress enacted the dedication of equipment and distinct needs tests in 1957 and did not repeal them in 1980 tells us nothing about how Congress intended the Commission to interpret the statutory definition of contract carriage
 
 
 [14]
 The petitioners also argue that the decision not to require shipper support is inconsistent with the Commission's own regulations concerning contract carrier applications. They cite 49 C.F.R. Sec. 1160.5, which provides:
 Sec. 1160.5 Information to be submitted by applicants ...
 (c) A separate verified statement from the applicant ...
 (d) Verified certifications of witness or shipper support ...
 The petitioners assert that, because the regulation requires a statement from the applicant and verified certifications of witness or shipper support, an applicant must submit statements of support from shippers or other users of the proposed service, as well as its own statement. The Commission has stated, however, that "[t]here is no legal or policy reason why contract carrier applicants cannot themselves act in the capacity of a witness and file their own supporting statements for class or industrywide applications." Issuance of Permits Authorizing Industry-wide Service, 133 M.C.C. 298, 302 n. 7 (1983). The petitioners have not pointed to anything in the statute or its legislative history which suggests that the Commission's interpretation of the regulation is an impermissible one. See Aero Mayflower Transit Co. v. ICC, 711 F.2d 224, 227 n. 26 (D.C.Cir.1983) ("Courts normally will defer substantially to an agency's interpretation of its own regulations.").