**GLOBAL VAN LINES, INC., and Wheaton Van Lines, Inc., Petitioners,**

v.

**INTERSTATE COMMERCE COMMISSION and United States of America, Respondents**

**Interstate Van Lines, Inc., Intervenor.**

**No. 83–1938.**

United States Court of Appeals, District of Columbia Circuit.

Argued May 1, 1984.

Decided Nov. 12, 1986.

---

Alan F. Wohlstetter, with whom Stanley I. Goldman, Washington, D.C., was on the brief, for petitioners.

Charles A. Stark, Atty., I.C.C., with whom J. Paul McGrath, Asst. Atty. Gen., Dept. of Justice, John Broadley, General Counsel, I.C.C., at the time the brief was filed, Henri F. Rush, Associate General Counsel, I.C.C., Robert B. Nicholson and Edward T. Hand, Attys., Dept. of Justice, were on the brief, for respondents. William J. Roberts, Atty., Dept. of Justice, Washington, D.C., also entered an appearance, for respondent U.S.

Marshall Kragen, Washington, D.C., for intervenor.

Before ROBINSON and BORK, Circuit Judges, and PALMIERI,* Senior District Judge.

Opinion for the Court filed by Circuit Judge SPOTTSWOOD W. ROBINSON, III.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

For fully a half-century, federal legislation has exerted a profound influence on motor common and contract carriage, the two modes of transportation in which the interstate trucking industry principally engages.[1] The central inquiry ultimately necessitated by this petition for review is the degree of precision with which the Interstate Commerce Commission must frame the operating permit of a motor contract carrier of property,[2] when based upon a distinct need of shippers for a particularized transportation service,[3] to confine the service to shippers sharing that need. We hold that the Commission is statutorily empowered to issue such permits only in terms assuring that the provision of service will be so circumscribed.

## I. THE STATUTORY SCHEME

At the heart of this litigation are the statutory concept of a motor contract carrier of property[4] and the role that concept has in extensions by interstate truckers of preferential services and rates to selected customers by means of individual agreements for the transportation of property.[5] Authority to favor customers in this fashion has waxed and waned over the years concomitantly with action by Congress, the Commission and the courts.

The Motor Carrier Act of 1935,[6] which initiated federal regulation of the trucking industry, defined a contract carrier simply in terms of one engaged in transportation for compensation under special and individual agreements with customers.[7] A common carrier, in contrast, was one undertaking transportation over regular or irregular routes for compensation for any member of the general public desiring it.[8] In 1956, the

---

\* Of the United States District Court for the Southern District of New York, sitting by designation pursuant to 28 U.S.C. § 294(d) (1982).

1. A "motor common carrier" is "a person holding itself out to the general public to provide motor vehicle transportation for compensation over regular or irregular routes, or both." 49 U.S.C. § 10102(13) (1982). The term "motor contract carrier" encompasses both a "motor contract carrier" of passengers, defined at *id.* § 10102(14)(A), and a "motor contract carrier" of property, defined as "a person providing motor vehicle transportation of property for compensation under continuing agreements with one or more persons ... (i) by assigning motor vehicles for a continuing period of time for the exclusive use of each such person; or (ii) designed to meet the distinct needs of each such person," *id.* § 10102(14)(B). A "motor private carrier" is defined at *id.* § 10102(15). See *Mercury Motor Express, Inc. v. United States,* 648 F.2d 315, 317 (5th Cir.1981). The word "person" includes entities as well as individuals, 1 U.S.C. § 1 (1982), and representatives as well as principals. 49 U.S.C. § 10102(17) (1982). The case at bar does not involve either a motor contract carrier of passengers or a motor private carrier, nor does it present any issue relating to the assignment-of-motor vehicles clause of the definition of motor contract carriage of property.

2. The Commission issues certificates to motor common carriers pursuant to 49 U.S.C. § 10922 (1982), and permits to motor contract carriers pursuant to *id.* § 10923. Throughout this opinion, "common carrier" refers only to a motor common carrier, and "contract carrier" only to a motor contract carrier of property.

3. See *id.* § 10102(14)(A)(ii), quoted in relevant part *supra* note 1.

4. See note 1 *supra.*

5. An interstate motor common carrier may not "charge or receive from a person a different compensation ... for a service rendered, or to be rendered, ... than it charges or receives from another person in performing a like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances," nor may it "subject a person ... to unreasonable discrimination." 49 U.S.C. § 10741(a)–(b) (1982). These proscriptions do not apply to motor contract carriers. *Central & S. Motor Freight Tariff Ass'n v. United States,* 244 U.S.App.D.C. 226, 250, 757 F.2d 301, 325, *cert. denied,* — U.S. —, 106 S.Ct. 568, 88 L.Ed.2d 553 (1985).

6. Ch. 498, 49 Stat. 543.

7. *Id.* § 203(a)(15), 49 Stat. 544–545.

8. *Id.* § 203(a)(14), 49 Stat. 544.

Supreme Court read the definition of motor contract carrier expansively in holding that a trucker securing 69 contracts for transportation of steel products retained its status as a contract carrier.[9] If specialization was an indispensable ingredient of contract carriage, the Court said, that requirement was satisfied by the fact that the carrier hauled only strictly limited types of steel products under individual and continuing agreements with a comparatively small number of shippers throughout a large area.[10] Active solicitation of customers did not support a finding that the carrier was holding itself out as a supplier of transportation to the general public, the Court continued,[11] because it was free to search aggressively for new business within the limits of its license.[12]

In 1957, Congress amended the Motor Carrier Act to sharpen the distinction between common and contract carriage, and in the process effectively terminated the contract carrier practice which the Court had upheld.[13] Motor contract carriage was redefined as transportation for compensation

under continuing contracts with one person or a limited number of persons either (a) for the furnishing of transportation services through the assignment of motor vehicles for a continuing period of time to the exclusive use of each person served or (b) for the furnishing of transportation services designed to meet the distinct need of each individual customer.[14] Thus, contract carriage thereafter necessitated a continuing contract between the carrier and the shipper, and either a dedication of equipment or a transportation service adapted to a distinct shipper's need. A carrier seeking contract-carriage authority by resort to the latter alternative must show that the shipper has a " 'distinct need' for a different or a more select or a more specialized service," [15] and that the carrier's service is "specialized and tailored to" that need.[16]

This definition of contract carriage remained substantively unchanged from 1957 to 1980.[17] During that era, contract-carriage applicants attempting to demonstrate distinct shipper needs frequently sought to provide a particular service to only one shipper.[18] On some

---

**9.** *United States v. Contract Steel Carriers, Inc.,* 350 U.S. 409, 412, 76 S.Ct. 461, 463, 100 L.Ed. 482, 485 (1956).

**10.** *Id.* at 411, 76 S.Ct. at 463, 100 L.Ed. at 485.

**11.** *Id.* at 411–412, 76 S.Ct. at 463, 100 L.Ed. at 485.

**12.** *Id.* at 412, 76 S.Ct. at 463, 100 L.Ed. at 485.

**13.** The bill eventuating in the 1957 amendments was introduced at the request of the Commission, whose chairman testified that "[o]ne of the most difficult problems with which the Commission has been faced in recent years in connection with the regulation of motor carriers is the question of determining the line of demarcation between contract carriers and common carriers," and that "some contract carriers have been able to acquire so many contracts that they are actually performing common carrier service." S.Rep. No. 703, 85th Cong., 1st Sess. 2, 3 (1957), *reprinted in* [1957] U.S.Code Cong. & Admin. News 1599, 1600–1601; H.R.Rep. No. 970, 85th Cong., 1st Sess. 2 (1957). The amendments implicated directly the Supreme Court's decision in *United States v. Contract Steel Carriers, supra* note 9. H.R.Rep. No. 970, *supra,* at 3 ("[f]reedom to solicit customers without restriction as

to specialized service obliterates the distinction which Congress intended to make between common and contract carriers, and opens the door to unjust discrimination among shippers"); see also S.Rep. No. 703, *supra,* at 3, *reprinted in* [1957] U.S.Code Cong. & Admin.News at 1601.

**14.** Pub.L. No. 85–163, § 1, 71 Stat. 411 (1957). Beyond peradventure, this legislation changed the result of *United States v. Contract Steel Carriers, Inc., supra* note 9. *ICC v. J–T Transp. Co.,* 368 U.S. 81, 87 & n. 4, 82 S.Ct. 204, 208 & n. 4, 7 L.Ed.2d 147, 153 & n. 4 (1961).

**15.** *ICC v. J–T Transp. Co., supra* note 14, 368 U.S. at 90–91, 82 S.Ct. at 210, 7 L.Ed.2d at 155.

**16.** *Id.* at 90, 82 S.Ct. at 210, 7 L.Ed.2d at 155.

**17.** A revision and recodification in 1978 changed "each person served" and "each individual customer" to "each such person," Pub.L. No. 95–473, 92 Stat. 1337, 1338–1339, but did not effect any substantive alteration, *id.* § 3, at 1466.

**18.** See, e.g., *Loomis Armored Car Serv., Inc. Extension—S. Dak.,* 130 M.C.C. 182 (1978); *Wells*

occasions, however, the Commission approved permits for service to discrete classes of persons when a distinct need common to the shippers comprising the class could be shown.[19] The Motor Carrier Act of 1980 [20] freed both common and contract carriers from a number of regulatory controls but left the distinction between common and contract carriage largely intact. The definition of motor contract carriage was amended in but one respect: continuing agreements, which previously could have been made only with "one person or a limited number of persons," [21] can now be made with "one or more persons" without numerical limit.[22] Such was the relevant statutory law when the instant controversy arose.

## II. THE PRESENT CASE

Interstate Van Lines, Inc., applied to the Commission for authority to truck household goods [23] under continuing contracts with "commercial shippers." [24] In a statement accompanying its application, Interstate discussed what it deemed the distinct needs of "national account shippers," who

**Fargo Armored Serv. Corp. Extension—Boston, Mass.,** 129 M.C.C. 615 (1978); *American Transp., Inc. Extension—Salem, Ohio,* 128 M.C.C. 240 (1977); *RPD, Inc. Extension—St. Louis Area,* 123 M.C.C. 691 (1975); *Royal Transp., Inc. Contract Carrier Application,* 120 M.C.C. 783 (1974); *Barko, Inc., Contract Carrier Application,* 114 M.C.C. 797 (1972); *Blue Fleet Distrib. Corp., Modification of Permit,* 113 M.C.C. 778 (1971); *Fairchild Gen. Freight Extension—Fiberboard Containers,* 113 M.C.C. 598 (1971); *Gypsum Haulage, Inc. Extension—Many States,* 108 M.C.C. 314 (1968); *Leary Extension—Willimantic, Conn.,* 81 M.C.C. 553 (1957).

**19.** See, e.g., *Brinks, Inc. Extension—Precious Metals,* 128 M.C.C. 253 (1977), *aff'd sub. nom. International Detective Serv., Inc. v. ICC,* 194 U.S.App.D.C. 55, 595 F.2d 862 (1979); *Howell Trucking Co. Extension—Secaucus, N.J.,* 86 M.C.C. 643 (1961); *Lane & Kaplan Extension—New Jersey,* 78 M.C.C. 547 (1958); *Brooks Armored Car Serv., Inc. Extension—New York, N.Y.,* 76 M.C.C. 517 (1958).

**20.** Pub.L. No. 92–296, 94 Stat. 793 (codified as amended principally in scattered sections of 49 U.S.C.) [hereinafter cited as codified].

**21.** See text *supra* at note 14. From 1962 until 1979, the Commission applied its "rule of eight," which construed the statutory language to mean that normally a contract carrier could serve no more than eight shippers. See *Umthun Trucking Co. Extension—Phosphatic Feed Supplements,* 91 M.C.C. 691, 697 (1962); S.Rep. No. 641, 96th Cong., 2d Sess. 10 (1980); H.R.Rep. No. 1069, 96th Cong., 2d Sess. 22, *reprinted in* [1980] U.S.Code Cong. & Admin.News 2283, 2304. This interpretation was abrogated in *Ex Parte No. MC–119, Policy Statement Regarding the "Rule of Eight" in Contract Carrier Application,* 44 Fed.Reg. 2470 (1979), *aff'd sub nom. Regular Common Carrier Conference v. United States,* 202 U.S.App.D.C. 248, 628 F.2d 248 (1980).

**22.** 49 U.S.C. § 10102(14)(B) (1982). The reason stated for the change was "[t]estimony ... clearly indicat[ing] that contract carrier services are unique and specially designed for the needs of particular shippers." S.Rep. No. 641, *supra* note 21, at 10. But the amendments explicitly left dedication of equipment or provision of a service to meet a shipper's distinct need as threshold requirements for contract carriage. S.Rep. No. 641, *supra* note 21, at 27; H.R.Rep. No. 1069, *supra* note 21, at 22, *reprinted in* [1980] U.S.Code Cong. & Admin.News at 2304.

**23.** The term "household goods" has a much more comprehensive scope under the Act than it has in common parlance. See 49 U.S.C. § 10102(11) (1982).

**24.** Petitioner's Appendix (P.App.) 5–16. The authority sought was for transportation of "household goods, between points in the United States (except Alaska and Hawaii) under a continuing contract or contracts with persons as defined at 49 U.S.C. § 10923 who are commercial shippers as defined at 49 C.F.R. § 1056.1(6) of the Commission's regulations." P.App. 5. Since § 10923 does not refine the general statutory definition of "person," see 1 U.S.C. § 1 (1982); 49 U.S.C. § 10102(17) (1982), presumably Interstate meant to include any or all commercial shippers. The regulation cited, 49 C.F.R. § 1056.1(b)(6) (1985), defines a commercial shipper as

> (a) any person, excluding the federal government, who is named as the consignor and/or consignee in a bill of lading contract who is not the owner of the goods being transported but who assumes the responsibility for payment of the transportation and other tariff charges for the account of the beneficial owner of the goods, normally an employee of the consignor and/or the consignee; or, (b) a freight forwarder which tenders a shipment to a carrier in furtherance of authorized or exempt freight forwarder operations.

apparently are synonymous with "commercial shippers,"[25] and who generate movements of household goods in high volume. Global Van Lines, Inc., and Wheaton Van Lines, Inc., jointly protested Interstate's application,[26] arguing that "commercial shippers" did not constitute a class appropriate for service under a contract-carrier permit resting solely upon the distinct-needs clause.[27]

The Commission's Review Board No. 3 agreed with the protestants and denied Interstate's application.[28] On Interstate's administrative appeal,[29] however, Division 1 of the Commission vacated the Review Board's decision, and not only granted the application but also widened Interstate's authority beyond its request.[30] Interstate was authorized

> [t]o operate as a *contract carrier*, by motor vehicle, in interstate or foreign commerce, over irregular routes, transporting *household goods*, between points in the United States (except Alaska and Hawaii), under continuing contract(s) with persons (except individuals) as defined at 1 U.S.C. § 1.[31]

Global and Wheaton petitioned this court for review of the order, and filed with the Commission a request for a stay. The Commission refused to grant a stay, but reopened the proceeding, *sua sponte*, with a view to clarification of the Division's decision.[32] Similarly, this court denied a motion for a stay pending review.[33]

Petitioners contend that the Motor Carrier Act does not allow the Commission to utilize the distinct-needs clause as the predicate for a contract-carrier permit conferring authority so great as to produce uncertainty as to whether the service to be furnished to each shipper will fit within the statutory definition of contract carriage.[34] As a threshold defense, the Commission argues that a separate statutory procedure provides the only method of challenging any such overbreadth.[35] Alternatively, the Commission and Interstate assert that the permit as written is guaranty enough that service in conformity with its terms will qualify as contract carriage within the meaning of the Act.[36]

We conclude that petitioners were free to mount their overbreadth attack on the per-

---

**25.** See P.App. 11–14.

**26.** P.App. 17–54. A motor carrier may protest a permit application if the carrier satisfies the standing requirements of 49 U.S.C. § 10923(b)(4) (1982). See *Aero Mayflower Transit Co. v. ICC,* 699 F.2d 938, 942–943 (7th Cir.1983). The protestants' standing has not been questioned.

**27.** P.App. 37–42.

**28.** *Interstate Van Lines, Inc. Extension—Household Goods* (West Springfield, Va.), I.C.C. No. MC–1745 (Sub-No. 17) (Mar. 21, 1983), P.App. 89–93. The Review Board ruled, *inter alia,* that the proposed service was no different from common-carrier service. *Id.* at 4, P.App. 92.

**29.** P.App. 94–107. See 49 U.S.C. § 10302 (1982); 49 C.F.R. § 1115.2 (1985).

**30.** *Interstate Van Lines, Inc. Extension—Household Goods* (West Springfield, Va.), I.C.C. No. MC–1745 (Sub-No. 17) (Aug. 18, 1983), P.App. 125–131 [hereinafter cited as *Division Decision* ].

**31.** *Division Decision, supra* note 30, app., P.App. 131 (emphasis in original). The term "commercial shipper," as defined by a Commission regu-

lation, does not include a shipper who owns the goods being transported. See note 24 *supra.* Interstate's application for contract-carrier authority to serve "persons ... who are commercial shippers" as so defined, see note 24 *supra,* would not, if granted, have enabled it to fully achieve its objectives. It was because Interstate's use of the commercial-shipper definition would not "provide [it] with the proper authority it requires to perform the broad service it proposes" that the shipper class was enlarged. *Division Decision, supra* note 30, at 3–4, P.App. 127–128.

**32.** *Interstate Van Lines, Inc. Extension—Household Goods* (West Springfield, Va.), I.C.C. No. MC–1745 (Sub-No. 17) (Sept. 9, 1983), P.App. 132–139 [hereinafter cited as *Commission Decision* ].

**33.** *Global Van Lines, Inc. v. ICC,* No. 83–1938 (D.C.Cir. Sept. 23, 1983) (order) (*per curiam* ).

**34.** Brief for Petitioners at 20–34.

**35.** Brief for Respondents at 28–32.

**36.** Brief for Respondents at 42–57; Brief for Intervenor at 16–22.

mit at the licensing stage. Additionally, after consideration of the statutory language, its legislative history, and explications of the distinct-needs requirement by the Commission and the courts, we hold that the Commission, in granting the permit, abdicated its responsibility to ensure that the transportation service it authorizes will harmonize with the Act's concept of contract carriage.

### III. THE METHODOLOGY OF PETI- TIONERS' DISTINCT–NEEDS CHALLENGE

The Commission insists that the question whether shippers have distinct needs within the meaning of the statutory definition of motor contract carriage is not one to be addressed during the process of formulating the operating authority that a permit is to confer.[37] The Commission analogizes a determination on distinct needs to one on whether particular property falls within the scope of a contract carrier's hauling authority, a matter which is not explored when the application for contract-carrier authority is under consideration.[38] The Commission also notes that the Motor Carrier Act of 1980 established an administrative procedure enabling a motor common carrier[39] to complain that a motor contract carrier is providing common-carrier service,[40] and asserts that this furnishes petitioners' sole remedy for impugning a carrier's provision of service on the ground that

it is inconsistent with the statutory concept of motor contract carriage.[41]

We reject this effort to defer consideration of petitioners' challenge, for it fails to take into account an affirmative duty imposed statutorily upon the Commission. Congress has decreed that "[t]he permit for a motor contract carrier shall specify necessary conditions, including each person or class of persons ... for which the carrier may provide transportation[,] ... to ensure that the carrier provides transportation as a motor contract carrier and within the scope of the permit."[42] It is evident from this unambiguous command that a permit for motor contract carriage must identify the person or class for which the carrier may furnish the service authorized, and that this, together with imposition of such other conditions as may be essential, must be done in order "to ensure that the carrier provides transportation as a motor contract carrier"—that is, service in conformity with the statutory concept of motor contract carrier—"and within the scope of the permit."

The impact of this directive on the instant case is very clear. When authority to conduct motor contract transportation is designed to accommodate a distinct need of a shipper or class of shippers, the permit must specify the potential customer or group of customers and any other necessary conditions with sufficient care and accuracy to safeguard against the possibility that a shipper lacking that need will be

---

**37.** Brief for Respondents at 28–33.

**38.** Brief for Respondents at 28–29 (citing *Carolina Freight Carriers Corp. v. ICC,* 201 U.S.App. D.C. 104, 105, 627 F.2d 563, 564 (1980)).

**39.** Both petitioners, and Interstate as well, possess motor common carrier authority. P.App. 10, 18, 27.

**40.** See 49 U.S.C. § 10925(e) (1982), under which, briefly described,

[t]he Commission must determine that the operations of the holder of the permit are no longer that of a contract carrier but instead constitute common carriage. Under this provision, a motor common carrier that competes with a particular contract carrier could file a complaint with the Commission alleging

that the contract carrier is no longer performing service as a contract carrier but is, in fact, providing motor common carrier service. The provision provides that, after a hearing and presentation of evidence, the Commission could decide to convert part or all of the contract carrier's permit or permits to a certificate if it found that the carrier's operations did not conform to the operations of a motor contract carrier and were those of a motor common carrier.

H.R.Rep. No. 1069, *supra* note 21, at 23, *reprinted in* [1980] U.S.Code Cong. & Admin.News at 2305.

**41.** Brief for Respondents at 29–32.

**42.** 49 U.S.C. § 10923(d)(2)(A) (1982).

served pursuant to that authority.[43] To the extent that a permit designates a class broader than those shippers who shared the need, the carrier will be left able to provide, consistently with the terms of the permit, at least some service that does not qualify as motor contract carriage. The permit will then have failed to ensure that the carrier provides the transportation authorized only as a motor contract carrier, and the Commission will have breached its duty to see that the permit does so.

█ We have no difficulty in reconciling, on the one hand, the Commission's affirmative duty to craft permits keeping contract carriers within their proper operational sphere and, on the other hand, the statutory procedure dealing with common-carrier complaints of excesses by contract carriers. It is our duty to give effect to all parts of a single statutory scheme if possible,[44] and we detect no discord between these two provisions when the former is treated as applicable to licensing activities and the latter is given operation only in consequence of non-licensing or post-licensing events.[45] We hold that a party with the requisite standing[46] may urge the Commission to refuse a pending contract-carrier permit that would not foreclose authority to engage in common-carrier service.

## IV. THE VALIDITY OF INTERSTATE'S PERMIT

The Commission ruled that the service sanctioned by Interstate's contract-carriage permit met the distinct-needs alternative of the statutory definition of motor-contract transportation.[47] Our analysis naturally begins with an examination of the elements of contract carriage that are critical to disposition of this case.

### A. The Elements of Contract Carriage

Motor contract carriage includes motor vehicle transportation for compensation (a) "under continuing agreements" (b) "with one or more persons" (c) "designed to meet" (d) "the distinct needs" (e) "of each such person."[48] The continuing-agreement requirement was imposed by Congress almost three decades ago to limit the ambit of contract carriage by relegating the movement of single shipments to common carriage.[49] The specification of "one or more persons" is not a requirement at all; rather, it is a relaxation of the earlier statutory provision restricting contract carriage to service to one person or a limited number of persons.[50] The Motor Carrier

---

**43.** The Commission contends that while § 10923(d)(2)(A) instructs it to impose conditions to ensure the provision of transportation only as a motor contract carrier, it affords no guidance as to how these conditions should be fashioned, and thus leaves the matter to the Commission's unbridled discretion. Brief for Respondents at 34. This argument is without merit, for the conditions to be specified expressly and mandatorily include the persons or class of persons to be served by the carrier pursuant to the permit. See note 42 *supra* and accompanying text. While the Commission has some discretion in designating them and in shaping any other needed conditions, *International Detective Serv., Inc. v. ICC,* 198 U.S.App.D.C. 334, 341 n. 17, 613 F.2d 1067, 1074 n. 17 (1979), it obviously cannot ignore a statutory directive.

**44.** *Reiter v. Sonotone Corp.,* 442 U.S. 330, 339, 99 S.Ct. 2326, 2331, 60 L.Ed.2d 931, 937 (1979); *Weinberger v. Hynson, Wescott & Dunning, Inc.,* 412 U.S. 609, 631–632, 93 S.Ct. 2469, 2484, 37 L.Ed.2d 207, 224 (1973); *In re Surface Mining Regulation Litig.,* 201 U.S.App.D.C. 360, 376, 627 F.2d 1346, 1362 (1980).

**45.** See *Global Van Lines, Inc. v. ICC,* 704 F.2d 829, 833–834 (5th Cir.), *modified,* 709 F.2d 11 (5th Cir.1983).

**46.** See note 26 *supra.*

**47.** *Commission Decision, supra* note 32, at 5–6, P.App. 136–137.

**48.** See 49 U.S.C. § 10102(14)(B) (1982), quoted in relevant part *supra* note 4. If the service proposed does not square with this definition, a contract-carriage permit therefor, of course, cannot issue. This does not imply, however, that an application meeting these specifications automatically commands such a permit since other requirements must also be satisfied. See 49 U.S.C. § 10923.

**49.** See *ICC v. J–T Transp., Co., supra* note 14, 368 U.S. at 87, 82 S.Ct. at 208, 7 L.Ed.2d at 153.

**50.** See S.Rep. No. 641, *supra* note 21, at 27; H.R.Rep. No. 1069, *supra* note 21, at 22, *reprinted in* [1980] U.S.Code Cong. & Admin.News at 2304. See text *supra* at note 14.

Act of 1980 left undisturbed a line of Commission decisions allowing a carrier to contract with groups of shippers shown to have distinct needs.[51]

■ The "designed to meet" component of contract carriage has been explained by the Supreme Court.[52] An applicant for a contract-carriage permit must demonstrate that the service proposed is "specialized and tailored" to a shipper's distinct needs.[53] Before the carrier can make this showing, it is necessary, of course, to identify those needs.[54]

The call for "distinct needs" sharply reduces the sphere of contract carriage. A distinct need, the Supreme Court has said, is a need "for a different or a more select or a more specialized service" than common carriage provides.[55] Illustrative is a "new service ... better tailored to fit the special requirements of a shipper's business, the length of its purse, or the select nature of the delivery service that is desired."[56] Contract carriage, moreover, must be designed to meet some distinct need "of each" shipper for whom it is authorized.[57] These criteria, however, must be applied with due regard to the changing transportation needs of shippers.[58]

## B. Interstate's Permit

■ The permit at issue allows Interstate to operate as a motor contract carrier "transporting household goods ... under continuing contract(s) with persons (except individuals) as defined at 1 U.S.C. 1."[59] It makes plain enough that this service must be furnished pursuant to continuing contracts with one or more persons, thus supplying those two elements of contract carriage. The permit, however, defines "persons" in such manner as to encompass all private business entities.[60] This poses the question whether the permit ensures that the transportation authorized will meet some distinct need of such an enormous and internally diverse class.

The Commission makes several arguments in an effort to demonstrate that Interstate's service under the permit will be only that of a motor contract carrier. The Commission maintains that the class defined does have distinct transportation needs because, it urges, only entities with special requirements will bargain for and bind themselves to continuing contracts designed to fulfill such needs.[61] It is not for us to say whether this hypothesis is true or false;[62] it is enough to reiterate that the

---

51. See note 19 *supra* and accompanying text.

52. *ICC v. J–T Transp. Co., supra* note 14.

53. 368 U.S. at 90, 82 S.Ct. at 210, 7 L.Ed.2d at 155.

54. *Id.* at 90–91, 82 S.Ct. at 210, 7 L.Ed.2d at 155.

55. *Id.* at 91, 82 S.Ct. at 210, 7 L.Ed.2d at 155.

56. *Id.* at 93, 82 S.Ct. at 211, 7 L.Ed.2d at 156.

57. See note 1 *supra.*

58. *Global Van Lines, Inc. v. ICC, supra* note 45, 704 F.2d at 832.

59. See text *supra* at note 31 (emphasis omitted).

60. The class designated consists of "persons (except individuals) as defined at 1 U.S.C. 1." See text *supra* at note 31. The provision referred to, 1 U.S.C. § 1 (1982), specifies that "the word[ ] 'person' ... include[s] corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals...."

61. Brief for Respondents at 17.

62. Indeed, it is doubtful that we should give this point any consideration at all. In its decision, the Commission merely stated that "[b]y requiring Interstate to enter into continuing contracts with persons described in 1 U.S.C. [§] 1, we are satisfied that the class is sufficiently limited that it meets the test of contract carriage." *Commission Decision, supra* note 32, at 4, P.App. 135. Only doubtfully does this seem tantamount to saying that continuing contracts will ensure distinct needs, and "appellate counsel's *post hoc* rationalizations" are not an acceptable substitute. *Ashland Oil, Inc. v. FTC,* 179 U.S.App.D.C. 22, 26, 548 F.2d 977, 981 (1976) (quoting *Burlington Truck Lines v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207, 216 (1962)). See also *Securities Indus. Ass'n v. Board of Governors,* 468 U.S. 137, 143–144, 104 S.Ct. 2979, 2983, 82 L.Ed.2d 107, 113–114 (1984); *SEC v. Chenery Corp.,* 318 U.S. 80, 88, 63 S.Ct. 454, 459, 87 L.Ed. 626, 633 (1943); *Wisconsin Elec. Power Co. v. Department of Energy,* 250 U.S.App.D.C. 128, 132, 778 F.2d 1, 5 (1985).

Motor Carrier Act, separately from and additionally to its demand for a continuing contract, makes a distinct shipper need a prerequisite to motor contract carriage.[63] Had Congress believed that continuing contracts perforce identify shippers with such a need, retention of the independent distinct-needs requirement would have been wholly superfluous. Moreover, we have previously noted, we must construe a statute so as to give meaning to each of its parts,[64] and this can be accomplished only by holding that the mere existence of a continuing agreement between a carrier and a shipper is insufficient to ensure that the service to be provided is calculated to meet a distinct need of the shipper, or even that such a need exists. It follows that Interstate's permit, which demands no more than that the transportation authorized be afforded pursuant to a continuing contract, is deficient in that respect.[65]

. The Commission further contends, however, that although Interstate's permit by its terms authorizes contract-carriage service to shipping entities indiscriminately, it was meant to allow that service only to national account shippers,[66] a class assertedly congruent with those found in the past to have distinct needs.[67] True it is that in seeking to clarify Division 1's decision, the Commission attributed distinct needs to

**63.** See text *supra* at notes 44, 51–54.

**64.** See note 44 *supra* and accompanying text.

**65.** We recognize, of course, that the role of a court reviewing an agency's construction of a statute which it administers is limited to ascertaining whether the agency's reading is "arbitrary [or] capricous." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843–844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694, 702–703 (1984). See also *Blum v. Bacon,* 457 U.S. 132, 141, 102 S.Ct. 2355, 2361, 72 L.Ed.2d 728, 736 (1982); *Storer Communications, Inc. v. FCC,* 246 U.S.App.D.C. 146, 150, 763 F.2d 436, 440 (1985); *Eagle-Picher Indus., Inc. v. EPA,* 245 U.S.App.D.C. 196, 201 n. 5, 759 F.2d 922, 927 n. 5 (1985). To qualify for judicial deference, however, the agency's interpretation must not be inconsistent with a clearly-appearing congressional purpose. See *Morton v. Ruiz,* 415 U.S. 199, 237, 94 S.Ct. 1055, 1075, 39 L.Ed.2d 270, 295 (1974). The Commission's treatment of the distinct-needs requirement is manifestly contrary to the plain language and evident meaning of the Act.

**66.** The Division's decision does refer to "commercial or national account firms," *Division Decision, supra* note 30, at 3, P.App. 127, but it goes on to authorize, for stated reasons, see note 31 *supra,* service to "persons (except individuals) as defined at 1 U.S.C. 1," *id.* at app., P.App. 131. See notes 26, 60 *supra.* The Commission's later clarifying decision similarly mentions " 'national account shippers,' " *Commission Decision, supra* note 32, at 5 (quoting Verified Statement of Donald Morrissette at 3, P.App. 80), and "large volume corporate shippers," *id.,* but it does not alter the authority previously conferred.

**67.** See *Global Van Lines, Inc. v. ICC, supra* note 45, 704 F.2d at 832–834; and *Wheaton Van Lines, Inc. v. ICC,* 731 F.2d 1264, 1267–1268 (7th Cir.1984), wherein the courts affirmed grants of motor contract carrier permits to serve individually-named large-volume shippers of household goods.

In June, 1983, the Commission solicited comments on a proposal to issue permits allowing industry-wide service by motor contract carriers. 48 Fed.Reg. 24,397 (1983). In December, 1983, after its decision in this case, the Commission released a policy statement declaring that it would grant such permits in proper cases. *Motor Contract Carriers of Property—Proposal to Allow Issuance of Permits Authorizing Industry-Wide Service,* 133 M.C.C. 298 (1983). This policy does not bear significantly on the case before us. The Commission recognized the "relevant statutory limitation ... that the applicant who proposes to serve a class of persons or an industry under contract must still meet the criteria for contract carriage. It must show that it will meet either the equipment dedication or the distinct needs test." *Id.* at 301. The latter test could be satisfied, the Commission said, by "evidence on the generic transportation requirements of the particular shipper class that would be better met by contract carriers than by common carriers." *Id.* On this basis, the Commission insisted that the "policy to permit class or industrywide applications ... distinguish[es] between common and contract operations, because applicants would still have to meet the contract carrier criteria, and provide service under continuing contracts with shippers." *Id.* at 302. In its discussion, the Commission referred to the case before us, but as one involving service to commercial shippers, *id.* at 300–301—a characterization which, for reasons about to be discussed, we cannot accept. See text *infra* at notes 68–72. Petitions for review of the policy authorizing industry-wide service were filed in this court, but we held that the controversy was not ripe for review. *American Trucking Ass'ns v. ICC,* 241 U.S.App.D.C. 350, 747 F.2d 787 (1984) (order).

that class of shippers,[68] but any reliance at this juncture upon the needs claimed for national account shippers is misplaced if for no reason than that Interstate's permit did not specify them as the class it could serve. Even if the Commission had actually intended to restrict Interstate's authority to transportation for national account shippers, it did not discharge its statutory responsibility to incorporate that limitation into the permit itself.[69] But equally importantly, it could not have been the agency's purpose to designate national account shippers as the class. Interstate asked for a class composed of "commercial shippers,"[70] the term by which national account shippers are also known.[71] It was for the very reason that commercial shippers were too small a class to fully utilize Interstate's proposed service that the class was enlarged to the one defined in the permit.[72]

The Commission argues additionally that the permit granted Interstate is validated by the Motor Carrier Act of 1980.[73] That legislation reformed motor carriage in a number of ways with a view to reducing and promoting competition,[74] and in the process altered the definition of contract carriage to sanction continuing contracts made between carriers and "one or more persons"[75]—contracts which under earlier statutes could exist only with "one person or a limited number of persons."[76] The Commission suggests that the distinct-needs requirement was also relaxed,[77] but we see no indication of an intention to endow the Commission with authority to disregard a clear legislative command. In 1980, Congress modified but retained the dual scheme of motor common and contract carriage, and although Congress anticipated that this definitional change would strengthen motor contract carriage by enlarging the number of shippers who could be served,[78] it plainly did not contemplate emasculation of a positive statutory requirement.[79] Nor can the Commission achieve that result by selective appeal to elements of the national transportation policy.[80] While Congress announced its interest in stimulating increased competition among motor carriers, it explicitly contin-

---

**68.** *Commission Decision, supra* note 32, at 5–6, P.App. 136–137. See note 25 *supra.*

**69.** This omission involves more than mere technicality. As petitioners observe, the wisdom of Congress in requiring that "[t]he permit ... shall specify ... each person or class ... for which the carrier may provide transportation," 49 U.S.C. § 10923(d)(2) (1982), is illustrated by the problem that has already arisen regarding whom Interstate may serve. Reply Brief for Petitioners at 12.

**70.** See note 24 *supra* and accompanying text.

**71.** See note 25 *supra* and accompanying text.

**72.** See note 30 *supra* and accompanying text.

**73.** Brief for Respondents at 38–42.

**74.** See, e.g., *Regular Common Carrier Conference v. United States,* 256 U.S.App.D.C. ——, ——, 803 F.2d 1186, 1194 (D.C.Cir.1986); *Astron Forwarding Co. v. ICC,* 229 U.S.App.D.C. 113, 116 n. 10, 711 F.2d 391, 394 n. 10 (1983).

**75.** 49 U.S.C. § 10102(14)(B) (1982).

**76.** See note 14 *supra* and accompanying text.

**77.** Brief for Respondents at 40–42.

**78.** S.Rep. No. 641, *supra* note 21, at 27; H.R. Rep. No. 1069, *supra* note 21, at 22, *reprinted in* [1980] U.S.Code Cong. & Admin.News at 2304.

**79.** Congress intended that the Commission recognize the importance of competition in motor carrier operations. H.R.Rep. No. 1069, *supra* note 21, at 12, *reprinted in* [1980] U.S.Code Cong. & Admin.News at 2294. But it admonished the Commission to stay within the powers vested in it by the revised law. S.Rep. No. 641, *supra* note 21, at 5; H.R.Rep. No. 1069, *supra* note 21, at 11, *reprinted in* [1980] U.S.Code Cong. & Admin.News at 2293. Cf. *Argo-Collier Truck Lines Corp. v. United States,* 611 F.2d 149, 155 (6th Cir.1979) (Commission not free to take steps to promote competition "in disregard of other policies articulated by Congress").

**80.** The national transportation policy, see 49 U.S.C. § 10101 (1982), includes, *inter alia,* for all nonrail carriers promotion of economical transportation and encouragement of reasonable rates for transportation without unreasonable discrimination, *id.* § 10101(a)(1)(B), (D), and for all motor carriers, promotions of competitive and efficient transportation service, *id.* § 10101(a)(2).

ued to insist that those who wished to operate as motor contract carriers either dedicate equipment for a shipper's exclusive use or devise a service to meet a distinct shipper need.[81] Moreover, the legislative history reveals with equal clarity that Congress did not mean to ease the demand for a distinct shipper need when it amended the definition of motor contract carriage.[82] Had Congress really been prepared to tolerate dilution of that longstanding provision, in order to enhance competition or for any other reason, it certainly could have chosen a much better way of doing so.[83]

The Commission's remaining arguments for affirmance of the order under review are even less impressive. It is said that the Commission can rely upon Interstate to serve only those shippers having distinct needs,[84] at least until Interstate proves itself to be unworthy of this trust.[85] To be sure, Interstate represented that it would so limit its contract-carriage operations[86] and the Commission credited this promise,[87] but that is beside the point. Under the governing statutory law, we repeat, every permit for contract carriage must specify the person or class to be served, and must do so with enough particularity to assure that the permittee's operations will remain those of a contract carrier.[88] Designation of shippers having distinct needs is the function of the Commission, and is not to be the fortuitous product of the carrier's activity.[89]

**81.** See 49 U.S.C. § 10102(14)(B) (1982), quoted in relevant part *supra* note 1.

**82.** "Motor contract carriers will continue to be required to meet the standard of dedication of equipment or providing a service to meet a shipper's distinct need, but will be able to expand their service to serve more shippers." H.R.Rep. No. 1069, *supra* note 21, at 22, *reprinted in* [1980] U.S.Code Cong. & Admin.News at 2304. Sée, to the same effect, S.Rep. No. 641, *supra* note 21, at 27. This expansion of service derives, of course, from relaxation of the "limited number of persons" restriction.

**83.** Our recent decision in *Regular Common Carrier Conference v. United States, supra* note 74, may be readily distinguished. There, three applicants sought contract-carriage authority to haul for commercial shippers. Each applicant asserted entitlement through dedications of equipment, and one applicant claimed additionally that it would also meet the shippers' distinct needs. The Commission rejected protests, accepted the applicants' contentions, and granted all three applications. This court affirmed, perceiving no error in the Commission's findings respecting the alleged equipment dedications or the class to be served. The court deemed it therefore unnecessary to address the single claim of the distinct needs, 256 U.S.App.D.C. at ——, n. 12, 803 F.2d at 1194, n. 12; indeed, the protestants conceded in this court that " 'a specialized need inhering in the entire class' of shippers to be served sufficed for the purpose." *Id.* (quoting Brief for Petitioner International Brotherhood of Teamsters at 16). While some amount of statutory construction was necessary, in connection with which the legislative policy of enhanced competition became an aid, unlike the case at bar there was no occasion or effort to override a statute whose meaning was evident from both the clarity of its text and the emphasis of its legislative history.

**84.** Brief for Respondents at 27–29.

**85.** The suggestion is that proof thereof would arise from a § 10925(e) proceeding. See text *supra* at note 40.

**86.** Verified Rebuttal Statement of Donald Morrissette, 2–3, P.App. 81–82; *Commission Decision, supra* note 32, at 4, P.App. 135.

**87.** "We have no reason to believe that in soliciting contracts and providing service thereunder Interstate will exceed the limits of proper contract carriage." *Commission Decision, supra* note 32, at 6, P.App. 137.

**88.** See text *supra* at notes 42–44.

**89.** The Act specifies that "[t]he permit ... shall specify ... each person or class of persons ... for which the carrier may provide transportation...." 49 U.S.C. § 10923(d)(2) (1982).

The Commission observes that allowing carriers to make the determinations on distinct needs obviates $350 filing fees on separate applications for each shipper, a requirement the agency characterizes as anticompetitive. Brief for Respondents at 62. Were agency filing fees at all relevant to an inquiry into whether the Commission has discharged its statutory duty to affirmatively specify the person or class to be served—and they are not—we would note that an applicant is always free to seek contract-carrier authority to serve a multimember class of shippers so long as the service is designed to

Lastly, it is insisted that the Commission found that Interstate's service is designed to meet the distinct needs of each shipper in the class defined by the permit.[90] The "finding" referred to, however, is nothing more than the Commission's conclusion attributable to its faulty rationale that it sufficed that Interstate undertook to limit its service to shippers willing to enter into continuing contracts.[91] We need not say more on this score than we already have.[92]

## V. Conclusion

The Commission predicated Interstate's permit on the premise that it would engage in transportation of household goods under continuing agreements designed to meet distinct needs of each shipper. Had the permit actually confined exercises of the granted authority within these boundaries, it would have passed statutory muster. But though we give deference to the Commission's construction of the relevant statutory provisions,[93] we must hold that the grant to Interstate was not in accordance with law.

■ Our decision today should not be read to discourage the Commission's issuance of class permits carefully circumscribed by the distinct needs of the class.[94]

Moreover, a class permit may properly include not just one class but a series of defined classes with distinct needs. Interstate's permit, in contrast, allows it to haul household goods under continuing contracts with any of the numerous business entities that might desire its service, and whose diverse needs have not been shown to be invariably distinct. The permit thus does not specify the class to be served with the precision necessary to ensure that Interstate will function thereunder only as a motor contract carrier, and therefore defies an unambiguous mandate of the Motor Carrier Act. We accordingly reverse the order under review and remand this case to the Commission for further proceedings consistent with this opinion.[95]

*So ordered.*

---

meet the distinct needs of such shippers. See notes 20–22 *supra.*

**90.** Brief for Respondents at 48–50.

**91.** The Commission said:
As we read Division 1's decision, it does not authorize indiscriminate service to any shipper of household goods (except individuals) meeting the 1 U.S.C. 1 definition. Rather, shippers in the class must actually enter into continuing contracts with Interstate. By requiring Interstate to enter into continuing contracts with the persons described in 1 U.S.C. 1, we are satisfied that the class is sufficiently limited that it meets the test of contract carriage. Interstate has represented to the Commission that it will enter into contracts only with those shippers who have a distinct need for specialized equipment and specially trained drivers and who will guarantee a definite volume of loads to transport (Verified Rebuttal Statement of Donald Morrissette 2–3). Shippers who do not meet these requirements will continue to be served under

Interstate's nationwide common carrier authority.
*Commission Decision, supra* note 32, at 4–5, P.App. 135–136.

**92.** See text *supra* at notes 61–65.

**93.** See note 65 and accompanying text.

**94.** For example, it may be that computer manufacturers constitute a class with distinct needs; if their needs can be identified with accuracy, they may support the issuance of a class permit.

**95.** We agree with the Commission that when an agency committing an error of law has discretion to determine in the first instance how it should be rectified, the proper course is to remand the case for further agency consideration in harmony with the court's holding. E.g., *United States v. Saskatchewan Minerals,* 385 U.S. 94, 87 S.Ct. 254, 17 L.Ed.2d 192 (1966); *Brae Corp. v. United States,* 238 U.S.App.D.C. 352, 379, 740 F.2d 1023, 1050 (1984), *cert. denied,* 471 U.S. 1069, 105 S.Ct. 2149, 85 L.Ed.2d 505 (1985).